■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARK WILLIAMS, Appellant. [885 NYS2d 38]—

Judgment, Supreme Court, New York County (Charles J. Tejada, J.), rendered December 15, 2003, convicting defendant, after a jury trial, of criminal possession of a controlled substance in the second degree, and sentencing him, as a second felony offender, to a term of six years to life, unanimously affirmed.

On March 24, 2001, New York Police Department Sergeant David Ehrenberg was supervising a group of detectives in an undercover narcotics operation, and, along with Detective Dino Polichetti, was parked in an unmarked van on Riverside Drive between 136th and 137th Streets, when a white Mazda with New Jersey license plates parked in front of them, next to a fire hydrant. The officers watched as defendant exited the Mazda's passenger side, and a man later identified as Willy Allison exited the driver's side. The two men walked north to a stairway which led to an underpass beneath Riverside Drive.

Approximately 15 minutes later, defendant and Allison returned to the Mazda, and looked around them before getting into the car and driving away. The Mazda drove north on Riverside Drive, then made a U-turn between 138th and 139th Streets, crossing over double yellow lines and pavement "zebra striping," which designated that crossing and turning were not permitted.

Ehrenberg and Polichetti then pulled away from the curb, made a U-turn, placed a red turret light on the van's dashboard, and honked the van's horn (the van, a rental, had no siren).

Riding in the Mazda's passenger seat, defendant turned around and looked through the car's rear window at the unmarked van, which was following directly behind. Turning east onto 136th Street, Allison drove the Mazda toward Broadway, where it came to a halt because of other cars stopped at a red light. At that point, defendant jumped out of the Mazda and ran south down Broadway. When defendant exited the car, Ehrenberg—who was still inside the unmarked van—was approximately five feet away, and could see that in his right hand, defendant carried a clear plastic bag containing a white substance, which he suspected was cocaine. Ehrenberg jumped

out of the van and gave chase on foot, displayed his shield and yelled that he was a police officer.

As defendant ran past a laundromat located at 3357 Broadway, he threw the plastic bag through the open door. Continuing to give chase, Ehrenberg did not see where the bag actually landed.

At 3333 Broadway, defendant ran toward a building entrance, but was stopped by a locked door and security guards. Ehrenberg drew his gun and ordered defendant to the ground, and defendant complied. With no prompting from Ehrenberg, defendant said, "What the f*** are you doing? I have no drugs on me."

After other officers arrived at the scene, Ehrenberg returned to the laundromat, where he was joined by Detective Edward Paris. An unidentified laundromat patron pointed to a nearby dryer, atop which sat a clear plastic bag containing a white substance which resembled the bag Ehrenberg had seen defendant throw into the laundromat. Subsequent testing revealed that the bag contained cocaine weighing slightly more than 2.25 ounces. There were other patrons in the laundromat at the time, including several children.

Meanwhile, Detective Polichetti continued to chase the Mazda as Allison drove it recklessly down Broadway, finally stopping the car after pointing his gun at Allison and pulling the van in front of the Mazda so that Allison could drive no farther.

Defendant did not testify, but Allison did. He testified that he and defendant had driven from Cliffwood, New Jersey, to New York City because Allison wanted to buy Timberland boots, which could be purchased for a good price in Manhattan. Allison parked his car on Riverside Drive between 136th and 139th Streets, then walked down a stairway toward Broadway, stopping along the way to drink some hot chocolate. Deciding they wanted to go to a restaurant before shopping, the two men then returned to the parked car.

Driving south on Riverside Drive, Allison made a legal left turn onto 136th Street, when he heard a screeching sound behind him, and, looking back, saw a van approaching. Allison claimed that he did not make a U-turn while on Riverside Drive. The van pulled beside the Mazda, and its driver pointed a gun at Allison. The van did not display a red flashing light, and Allison had no reason to believe the two men inside of it were police officers.

Thinking he was being "carjacked," Allison attempted to escape. At some point, defendant jumped out of the Mazda and ran down the street. After attempting to elude the van for several blocks, the van cut off the Mazda, forcing it to stop, where-

upon a man with a gun approached, forced Allison to the ground, and began to search him. Only then did Allison realize he was being pursued by police officers.

Though he was initially charged with traffic infractions and drug possession, the charges against Allison were eventually dismissed.

At trial, Detective Manuel Soto testified that after the bag of cocaine was retrieved from the laundromat, it was given to him for vouchering. Over objection, he also testified that the cocaine had a value of approximately $2,000, and could be used to make somewhere between 126 and almost 200 packets of cocaine, which number would vary, according to the quality of the cocaine. He also testified, again over objection, that the cocaine could be made into crack by crystallizing it. Crystallization would result in over one hundred "rocks." He was also permitted to testify that 2½ ounces of cocaine would likely result in death if consumed by one individual.

After testimony concluded for the day, and defense counsel voiced an objection for the record, stating: "[F]or the purposes of the record I'm objecting to the line of questioning pertaining to how much the street value of the cocaine is, how many bags or how many pieces it can be cut up into . . . . The defense in this case is not that these drugs were for [defendant's] own personal consumption. The defense is that these drugs did not belong to [defendant]. Therefore, because there is no charge in the indictment of sale of narcotics or criminal possession with intent to sell, I am noting my objection, for the record."

Thereafter, the People explained their position: "[I]f the defense is arguing that these are not the defendant's drugs, we believe it is very relevant to know the value of the drugs to explain how illogical it would be [that] another individual would have left over $2,000 worth of drugs in a laundromat unattended in that way. So it's in order to rebut the defense claim that these drugs that were in the laundromat were not the defendant's drugs is the reason we brought that out, your Honor."

The court then allowed the testimony.

On summation, defense counsel argued that the police work was "sloppy" because the police did not bring down to the station house an elderly man who had pointed out the cocaine in the laundromat. Defendant further argued: "[T]his is not a situation where a police officer stops a person and drugs are on the person. We know, we know whose drugs they are [in such a situation] if you believe that police officer. This is a situation where if you believe the lieutenant, the drugs were thrown. And

you know what, they were not recovered until a substantial time later. And you know what, how, how do you even know these are the very same drugs if you believe [Sgt. Ehrenberg] that came out of the hand of [defendant], how do we know that?"

Counsel suggested that the story about the patron had been fabricated, and that police were actually combing the area in a random search for drugs, "looking for something to pin on somebody. And they chose [defendant] because he got away, got out of the car, and he was alone with the lieutenant."

Responding to counsel's summation, the prosecutor argued: "[D]efense counsel wants you to believe that they're not defendant's drugs. Ladies and gentlemen, they're not defendant's drugs. Some other drug dealer left $2,000 worth of drugs in a laundromat on top of a machine. Somebody else decided to do that on a Saturday morning at ten o'clock in the morning. Does that make sense, ladies and gentlemen? No, it defies common sense. The drugs that were recovered are the exact same drugs the defendant threw in there just moments before."

Attempting to reconcile Sergeant Ehrenberg's testimony that defendant threw the bag of cocaine into the entryway of the laundromat with the fact that the bag was recovered from atop a dryer, the prosecutor argued that, "Clearly, the drugs were moved. There were children in there. They were playing, running around." The prosecutor continued, "We don't want them getting into the hands of children that were there that morning."

In addition, the prosecutor argued that, contrary to defendant's claim, the police work underlying defendant's arrest was not sloppy, but rather removed a quantity of cocaine from "the streets of New York, probably, more likely, the streets of New Jersey, where he was going to take it." Defense counsel's objection to this statement was sustained. The prosecutor then continued, arguing that the police had done well not only in removing the drugs from the streets, but also "in removing the individual, the defendant, who was trying to place those drugs on the street." Defense counsel's objection to this statement was overruled. The prosecutor also stated with regard to the police conduct: "[The police] were out there ladies and gentlemen, specifically to detect whether or not drugs were being distributed. They were out there doing that. And they were going to try to remove the individuals that were possessing those drugs . . . . [W]e pay them to try and detect this kind of activity. And that's what they did on this day. They detected it and they removed the drugs from the streets."

Defendant argues that the prosecutor violated his fundamental right to a fair trial by suggesting that he was guilty of a crime for which he was not accused, i.e., sale of drugs, and prejudiced him by inciting the jury to convict on the basis of supposition, rather than the evidence adduced at trial. We find that the People's summation comments, to the extent they were error, were harmless in light of the overwhelming evidence of defendant's guilt, and, in any event, although they could have been tempered, many were fair comment in response to defendant's charges that the police work was sloppy and that the police fabricated the charges.*

Clearly, it would have been more prudent for the People not to refer to defendant as a drug dealer, since he was only charged with possession. Nevertheless, when defendant accused the police of fabrication and sloppy work, because of the serendipitous discovery of a large amount of drugs in the laundromat into which defendant had just minutes before, during a pursuit, tossed the bag, the People were entitled to comment and respond. As much as anything, the ludicrousness of defendant's contention spurred the response in which the People commented derisively on the remarkable coincidence, at least according to defendant, that over two ounces of cocaine were found in plain view in a laundromat that defendant had just passed as he ran from the police.

The emphasis on defendant's status as a drug dealer, neither alleged nor proven, may have exceeded the bounds of fair comment and was better left unsaid, but "the over-all effect of the prosecutor's summation was within the range of acceptability" (*People v D'Alessandro*, 184 AD2d 114, 119 [1992], *lv denied* 81 NY2d 884 [1993]), particularly since it was defendant who suggested first that he was a random and innocent victim of police officers looking to connect the drugs to anybody in general. The comments certainly "did not amount to a persistent pattern of misconduct warranting reversal, particularly in light of the overwhelming evidence of defendant's guilt" (*People v Johnson*, 212 AD2d 362 [1995], *lv denied* 85 NY2d 939 [1995]). Defendant and his cohort were first observed by police officers acting suspiciously both after they parked the car, and before they

---

* Defendant also argues that the prosecutor's eliciting of testimony about the methods of cutting drugs when cocaine is obtained from a dealer and the toxicity, if ingested, was improper in this possession case. No basis exists on this record to have elicited such testimony, and, in any event, the probative value, if there were any, was outweighed by the potential prejudice. This line of questioning should have been excluded. Nonetheless, the permitting of such testimony does not warrant reversal because only a limited number of questions were involved in a lengthy trial, and we find the error to be harmless.

reentered it. After they made an illegal turn and the police put on the warning light, they did not stop but hastened to make a getaway. After exiting the vehicle, and despite being warned of the presence of police officers, defendant continued to run, and discarded a plastic bag which he could just as easily have left in his car, if it did not contain contraband. When the bag was located in the proximate area where it was discarded, it was found to contain cocaine. In light of such evidence, "there is not a significant likelihood" that the jury verdict, which was obviously the best barometer of the credibility of all the trial testimony, was unduly affected by the prosecutor's categorization of defendant as a drug dealer or any of the other questionable comments (see People v Brown, 208 AD2d 414 [1994]).

Defendant also argues that testimony elicited by the prosecutor as to the value of the cocaine and the yield it could produce was irrelevant to the crime for which defendant was being tried—criminal possession of a controlled substance in the second degree—and was "devastatingly prejudicial," as it suggested to the jury that defendant possessed the drugs with an intent to sell them. Yet, while irrelevant to the criminal charge against defendant, evidence of the cocaine's value and the number of doses it might yield was relevant to the question of whether and to what extent it was plausible (or, conversely, highly unlikely) that a person other than defendant might have left the bag of cocaine in the laundromat, as defendant claimed (see People v Giles, 11 NY3d 495, 499 [2008]).

In her summation, defense counsel argued that police had fabricated the claim that the Mazda made an illegal U-turn, and also argued that their stop of the Mazda was based upon a mere hunch, and that what actually drew the officers' attention was defendant's race and the Mazda's features.

In charging the jury, the trial court gave the following instruction: "[W]here a police officer has probable cause to believe that a driver of a car has committed a traffic infraction, a stop does not violate the New York State Constitution. In making a determination of probable cause, neither the primary motivation of the officer nor a determination of what a reasonable traffic officer would have done under the circumstances is relevant. Consequently, a violation of the Vehicle and Traffic Law can give the police probable cause to warrant a stop of the vehicle for a valid traffic infraction."

During deliberations, the jury sent out a note asking whether "the definition of 'beyond a reasonable doubt' applies to proving the 'probable cause' for attempting to pull [defendant and Allison] over." In response, the court recharged the jury: "[The]

People only have to prove the element[s] of the crime of criminal possession of [a] controlled substance in the second degree. And as I already instructed you, those elements must be proven beyond a reasonable doubt. The People at trial do not have to prove probable cause."

On appeal, defendant argues that the Supreme Court's charge that the police could stop the Mazda based upon their belief that a traffic infraction had occurred, without regard to whether there was a separate primary motive for the stop, requires reversal because it improperly required the jury to determine the legal issue of probable cause, diverted the jury from a full consideration of the police officers' credibility, bolstered the People's case, and was unnecessary and unduly prejudicial. Yet, the jury charge was taken verbatim from *People v Robinson* (97 NY2d 341, 349 [2001]), and constitutes an accurate statement of the law. Moreover, since defendant had suggested in his opening statement that the stop was based upon racial profiling, the charge was necessary, since it explained that if the jury found credible the police testimony that the police observed an illegal U-turn, it could find that there was a legal justification for the stop. Otherwise, the jury might conclude that notwithstanding the traffic infraction, the stopping of the car by the police was unjustified because of racial profiling, to which defense counsel had made reference. We see no prejudice in a charge which permits the jury to understand the circumstances under which a police officer may stop a vehicle, particularly when defendant has suggested the possibility of illegal conduct. Concur—Mazzarelli, J.P., Sweeny, Nardelli, Freedman and Richter, JJ.